UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:22-cv-01248-SB-AFM | Date: | June 17, 2022 |
|---|---|---|---|

| Title: | *Crown Intermediate Holdco Inc. v. Allianz Global Risks US Insurance Company et al.* |
|---|---|

| Present: The Honorable | STANLEY BLUMENFELD, JR., U.S. District Judge |
|---|---|

| Jennifer Graciano | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| N/A | N/A |

**Proceedings:** ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS [Dkt. No. 35]

Plaintiff Crown Intermediate Holdco, Inc., d/b/a Regal Cinemas (Regal) lost hundreds of millions of dollars in revenue when its movie theaters nationwide were forced to shut down or to operate at significantly reduced capacity by the COVID-19 pandemic and associated stay-at-home orders. Regal alleges that its insurers, Defendants Allianz Global Risks US Insurance Company (Allianz), Liberty Mutual Fire Insurance Company (Liberty), and Zurich American Insurance Company (Zurich), breached their insurance contracts by denying Regal's claims to recover some of its losses. Defendants move for judgment on the pleadings. Dkt. No. 35. The Court held a hearing on June 15, 2022, and took the motion under submission. Because Regal's losses are not covered by Defendants' policies, the motion is granted.

I.     BACKGROUND

Regal operates more than 500 movie theaters in more than 40 states, including approximately 80 theaters in California. Dkt. No. 1-1 at 3 of 487 (Compl.).[1]  Because "Regal's business model relies upon the ability of large groups of people to congregate in confined, indoor spaces for extended periods of time to watch movies," the COVID-19 pandemic and the resulting state and local stay-at-home orders "have devastated Regal's business" as its theaters became unusable. Id. at 3–4.  Regal alleges that it has lost hundreds of millions of dollars since March 2020, including lost ticket and concession sales and extra expenses for cleaning and remediation, and that even after the original stay-at-home orders were lifted or relaxed, it "continued to suffer losses due to the continuing presence of the virus at its theaters." Id. at 4.

Defendants sold Regal "all risk" property and business interruption policies for the period from June 1, 2019 to June 1, 2020. Id. at 19.  The policies, which are materially identical, are part of a shared insurance policy with a $250 million per-occurrence coverage limit. Id. at 20.  Liberty and Zurich were each allocated 40% of the coverage for any particular loss, with the remaining 20% allocated to Allianz. Id.  The policies insured Regal's theaters "against all risks of direct physical loss or damage," subject to certain exclusions. Id. at 50, 57 (Liberty Policy).[2]  The policies contain separate sections for "Property Damage" and "Time Element" coverage. Id. at 71, 89.  The latter covers business interruption losses as measured by either gross earnings or gross profit during the "Period of Liability," along with certain extra expenses and rent obligations, if the property is unusable as a result of a covered loss. Id. at 89–93.  The "Period of Liability" for buildings is defined as the period "(1) Starting from the time of physical loss or damage of the type insured; and (2) Ending when with due diligence and dispatch the building and equipment could be:  (a) Repaired or replaced; and (b) Made ready for

---

[1] Dkt. No. 1-1 contains 487 pages, including multiple exhibits that restart page numbering.  Citations in this opinion use the page numbers of the entire docket entry (e.g. page 3 of 487) rather than of the individual exhibits.

[2] All three policies are attached as exhibits to Regal's complaint and incorporated as part of the pleadings.  Regal alleges that all three policies follow the same terms and conditions of a single policy form.  Defendants do not dispute this, and it appears from the Court's review that the material terms of all three policies are identical.  For the sake of readability, the Court therefore cites only to the relevant provisions in Liberty's policy.

operations, under the same or equivalent physical and operating conditions that existed prior to the damage." *Id.* at 94.

The Time Element coverage includes a number of specific loss types that Regal invokes: (1) losses caused by physical loss or damage to "attraction property"—property owned by others on which Regal's business depends—within one mile of Regal's property; (2) losses incurred if a civil or military authority prohibits access to Regal's property because of physical loss or damage; and (3) losses caused when ingress or egress to the covered property is prevented as a direct result of physical loss or damage. *Id.* at 96–97, 99. The policies also include a communicable disease endorsement that covers certain costs associated with contamination by a communicable disease—including a virus—that is the "direct result of a covered loss." *Id.* at 158. Thus, all of the coverage Regal invokes depends, directly or indirectly, on "direct physical loss or damage" to Regal's property or to a nearby "attraction property."

Regal alleges that people can get infected by the COVID-19 virus through airborne transmission or through contact with a surface that has the virus on it, known as a fomite. *Id.* at 11. Regal alleges that fomites "can become infectious on a whole range of surfaces," including many that "are used throughout Regal's properties," and that "even extraordinary cleaning measures do not completely remove coronavirus from surfaces." *Id.* at 12, 14. Beginning in March 2020, state and local governments began imposing restrictions, often referred to as stay-at-home orders, that suspended or severely limited operations of non-essential businesses, with some of the orders stating that the virus was physically causing property loss or damage. *Id.* at 14–16. Although Regal does not discuss any specific theater it operates, it alleges generally that COVID-19 has been present at its theaters and has caused physical damage or loss, rendering the theaters unusable:

> Beginning in February/March 2020, the virus was present in the air in Regal's theaters and attached to the surfaces within the theaters, such as doors, tables, chairs, bathroom sinks, countertops, and toilets. Because COVID-19 is a pandemic, is present on Regal's properties and is statistically certain to have been carried by a percentage of untested individuals who have entered Regal's properties since March of 2020, COVID-19 is continually reintroduced to the air and surfaces of Regal's properties.

> Indeed, given infection rates in the areas in which Regal's theaters are located, it is certain that the theaters had the actual presence of the virus, and that any theater that then closed would have had the actual presence of the virus had it opened its doors.
>
> The virus compromised the physical integrity of Regal's theaters, tangibly altered the property and air therein, posed an imminent and continuous threat of reintroduction to Regal's theaters, rendered the theaters unusable and functionally uninhabitable for their intended purpose, and turned Regal's theaters into a gauntlet of deadly particles. Indeed, as a result of the virus and resultant Orders, Regal's theaters were forced to close, and even those that were ultimately able to reopen did so on a severely limited basis due to the continuing threat and presence of the virus. Thus, the virus and/or the Orders resulted in physical loss or damage to Regal's theaters.

*Id.* at 16–17.³ Regal alleges that "as a result of the COVID-19 pandemic and the presence of the virus at Regal's theaters, the risk of contracting a highly lethal disease by entering Regal's theaters was so high that individuals could not safely congregate in the theaters to watch movies, rendering them functionally uninhabitable and useless for their intended function." *Id.* at 17. As a result, Regal has lost hundreds of millions of dollars in revenue while incurring ongoing rent obligations and additional remediation and cleaning costs, such as sanitization and installation of plexiglass dividers at its theaters. *Id.* at 17–19.

      Contending that its losses are covered by Defendants' policies, Regal filed an insurance claim in April 2020. *Id.* at 28. Defendants, through their adjuster, denied Regal's claim in September 2020, primarily on the ground that Regal had not suffered any "physical loss or damage" at its theaters.⁴ *Id.* After Defendants reiterated their denial of coverage, Regal filed this suit in state court, alleging claims for breach of contract and declaratory judgment. Dkt. No. 1-1. Defendants removed based on diversity jurisdiction and now move for judgment on the pleadings. Dkt. Nos. 1, 35.

---

³ Regal also alleges that "given the many employees and moviegoers entering Regal's hundreds of theaters at the start of the pandemic, it is certain that the virus has been present at ***all*** of Regal's properties at some point since the COVID-19 pandemic began." Dkt. No. 1-1 at 16–17.

⁴ Defendants also invoked several exclusions.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A court may grant judgment on the pleadings if, "taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *McSherry v. City of Long Beach*, 423 F.3d 1015, 1021 (9th Cir. 2005). Analysis under Rule 12(c) is "substantially identical" to analysis under Rule 12(b)(6). *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). Under this standard, judgment is appropriate for the defendant where the complaint either fails to allege a "cognizable legal theory or fails to allege sufficient factual support for its legal theories." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016) (applying Rule 12(b)(6)). A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. DISCUSSION

Disputes about insurance coverage for business losses during the COVID-19 pandemic abound nationwide, and both parties rely on cases from a wide variety of jurisdictions applying different states' laws to interpret similar insurance policies. Although the policies here provide that they are governed by and construed in accordance with New York law, Dkt. No. 1-1 at 60, the parties agree that the analysis is the same under California law, on which they rely heavily. Dkt. No. 35 at 1 n.1; Dkt. No. 36 at 7. Under both states' laws, consistent with general principles of contract interpretation, courts interpret insurance policies (a question of law) by looking to the ordinary or plain meaning of the contract terms as a layperson would understand them, unless the parties have used them a technical or special meaning. *Pham Tran v. Utica First Ins. Co.*, 121 N.Y.S.3d 123, 125 (2020); *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). The insured bears the burden of establishing that the claim is within the basic scope of coverage, while the insurer bears the burden of establishing that an exclusion applies. *Borg-Warner Corp. v. Ins. Co. of N. Am.*, 577 N.Y.S.2d 953, 957 (1992); *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003).

The central dispute in this case is whether Regal has plausibly alleged that its properties suffered "direct physical loss or damage" as a result of the presence of COVID-19 or the resulting stay-at-home orders. That term is not defined in the policies, but "the overwhelming majority of cases to consider business income claims stemming from COVID-19 with similar policy language hold that 'direct physical loss or damage' to property requires some showing of actual or tangible harm to or intrusion on the property itself." *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191, 1200 (D. Kan. 2020) (collecting cases). For example, New York courts have concluded that "in order for there to be 'direct' 'physical' damage or loss to property, there be 'some physical problem with the covered property,' not just the mere loss of use. The property must be changed, damaged or affected in some tangible way, making it different from what it was before the claimed event occurred." *Consol. Rest. Operations, Inc. v. Westport Ins. Corp.* (*Consolidated*), 167 N.Y.S.3d 15, 205 A.D.3d 76, 82 (2022) (citation omitted). Similarly, under California law, "the phrase 'direct physical loss of or damage to' property" requires "physical alteration of property." *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 892 (9th Cir. 2021); *United Talent Agency v. Vigilant Ins. Co.* (*UTA*), 77 Cal. App. 5th 821, 830 (2022) ("[F]or there to be a 'loss' within the meaning of the policy, some external force must have acted upon the insured property to cause a physical change in the condition of the property, i.e., it must have been 'damaged' within the common understanding of that term." (quoting *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766, 780 (2010)).

Regal has not plausibly alleged that the COVID-19 virus physically damaged or altered any of its theaters. Regal relies on its allegations that the virus was present in its theaters and attached to surfaces, creating fomites that rendered the theaters unsuitable for their ordinary use. But considering the plain meaning of the policy's language, the Court is unpersuaded that any layperson or reasonable policyholder would understand the presence of a virus on some of the surfaces in Regal's theaters as physical damage or alteration of the theaters. *See UTA*, 77 Cal. App. 5th at 835 ("If, for example, a sick person walked into one of Plaintiffs' restaurants and left behind COVID-19 particulates on a countertop, it would strain credulity to say that the countertop was damaged or physically altered as a result." (quoting *Unmasked Mgmt., Inc. v. Century-Nat'l Ins. Co.*, 514 F. Supp. 3d 1217, 1226 (S.D. Cal. 2021)). To the contrary, "[m]any courts have rejected the theory that the presence of the virus constitutes physical loss or damage to property . . . . The majority of cases in California (and elsewhere) are in accord." *Id.* (collecting cases); *accord Musso & Frank Grill Co. v. Mitsui Sumitomo Ins. USA Inc.*, 77 Cal. App. 5th 753, 760 (2022) ("At this point, there is no real dispute. Under California

law, a business interruption policy that covers physical loss and damages does not provide coverage for losses incurred by reason of the COVID-19 pandemic."). Similarly, "[f]ederal courts applying substantive New York law have uniformly held that conclusory assertions that COVID-19 causes physical damage to property because it is contagious and hard to clean fail to state a basis for coverage where the policy requires direct physical loss or damage to the property." *Consolidated*, 205 A.D.3d at 83. These decisions are consistent with those of the vast majority of courts across the country that have considered similar claims. *See, e.g.*, *Hairabedian v. Sec. Nat'l Ins. Co.*, No. 2:22-CV-00920-SB-MAA, 2022 WL 1071508, at *4 (C.D. Cal. Mar. 10, 2022) ("COVID-19 harms people, not property. Multiple courts have therefore found that the presence or transmission of COVID-19 does not physically alter property, and this Court rejects that argument here." (citations omitted)); *Colectivo Coffee Roasters, Inc. v. Soc'y Ins.*, 2022 WI 36, 2022 WL 1758674, at *3 (June 1, 2022) ("As the overwhelming majority of the other courts that have addressed the same issue have concluded, the presence of COVID-19 does not constitute a physical loss of or damage to property because it does not 'alter the appearance, shape, color, structure, or other material dimension of the property.' The virus does not necessitate structural 'repairs or remediation'; it can be removed from a surface with a disinfectant. . . . [T]he danger of the virus is to 'people in close proximity to one another,' not to the real property itself." (citations omitted)).

To be sure, a handful of trial courts have allowed similar allegations to survive the pleading stage. *See Live Nation Ent., Inc. v. Factory Mut. Ins. Co.*, No. LACV2100862JAKKSX, 2022 WL 390712, at *6 (C.D. Cal. Feb. 3, 2022) (explaining that "[d]istrict courts in the Ninth Circuit have reached different outcomes as to whether the presence of COVID-19 can cause physical loss or damage to an insured property" and finding that "[t]he Complaint sufficiently alleges that infectious respiratory droplets, which transmit COVID-19, are physical objects that may alter the property on which they land and remain"). But it appears that every state and federal appellate court to consider the question has rejected Regal's position. *See Inns-by-the-Sea v. California Mut. Ins. Co.*, 71 Cal. App. 5th 688, 692 n.1 (2021) (noting that "[t]he overwhelming majority of federal district court cases" along with "each federal appellate court to consider the issue" "find no possibility of coverage under commercial property insurance policies for a business's pandemic-related loss of income"), *review denied* (Mar. 9, 2022); *UTA*, 77 Cal. App. 5th at 832 (noting that the Second, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have all ruled similarly). This is unsurprising, as Regal, like similar insureds alleging similar claims, does not identify any

physical damage the virus caused to any of its buildings. As the Seventh Circuit recently explained:

> Even if the virus was present *and* physically attached itself to [the plaintiff's] premises, [the plaintiff] does not allege that the virus *altered* the physical structures to which it attached, and there is no reason to think that it could have done so. While the impact of the virus on the world over the last year and a half can hardly be overstated, its impact on physical property is inconsequential: deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days.

*Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 335 (7th Cir. 2021). Regal's bare allegations of physical damage are therefore insufficient to support a plausible claim for insurance coverage.

Regal contends that the opinions dismissing similar COVID-19 insurance claims are inconsistent with or failed to consider *Inns-by-the-Sea*.[5] In *Inns-by-the-Sea*, the California Court of Appeal affirmed the dismissal without leave to amend of the plaintiff's insurance-related claims because the presence of COVID-19 did not damage the plaintiff's property. 71 Cal. App. 5th at 704–08. After explaining that the harm was caused by the impact of the pandemic on society at large rather than any damage to the plaintiff's physical property, the court mentioned that "it could be possible, in a hypothetical scenario, that an invisible airborne agent would cause a policyholder to suspend operations because of direct physical damage to property." *Id.* at 704. Regal seizes on this dicta, contends that its complaint alleges just such damage, and argues that *Inns-by-the Sea* therefore requires that Defendants' motion be denied. But as the Court of Appeal subsequently emphasized while rejecting this exact argument, "a discussion of a hypothetical scenario is not a statement of California law, and [the plaintiff] cites no other case suggesting that such a scenario demonstrates 'direct physical loss or damage.' To the contrary, other courts have rejected similar claims." *UTA*, 77 Cal. App. 5th at 839 (footnote omitted). And of course, the actual holding of *Inns-by-the-Sea*—that there was no insurance coverage and the plaintiff's property had not been

---

[5] Regal is correct that in some of the cases where insurance coverage was rejected, the insured had not alleged that COVID-19 was actually present on the insured's property. But many cases, including most of those cited in this opinion, do involve such allegations.

physically damaged by COVID-19—is entirely consistent with other decisions finding no coverage. Thus, Regal has not shown that California (or New York[6]) appellate courts are divided on this issue or that the Court should stay resolution of this matter pending further guidance from the states' highest courts, as it alternatively requests. *See Mudpie*, 15 F.4th at 890 n.3 (declining the plaintiff's certification request).

Nor is the Court's analysis altered by Regal's allegation that the policies do not contain a provision, commonly adopted in other business insurance policies, that expressly excludes losses due to viruses or bacteria. Dkt. No. 1-1 at 26–27. Indeed, both California and New York appellate courts have rejected this exact argument. *Consolidated*, 205 A.D.3d at 87 ("Plaintiff's argument that a property insurance policy without a virus exclusion provides coverage for loss or damage caused by viruses is contrary to well-settled law that 'exclusion clauses subtract from coverage rather than grant it.'" (quoting *Raymond Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 N.Y.3d 157, 163 (2005))); *Inns-by-the-Sea*, 71 Cal. App. 5th at 709 (rejecting identical argument "because it improperly attempts to rely on the absence of an exclusion to create an ambiguity in an otherwise unambiguous insuring clause," contrary to California law).

Finally, the older cases involving asbestos and risk of mudslides on which Regal relies are not in tension with the abundant case law holding that COVID-19 does not damage structures. The court in *UTA* persuasively distinguished these authorities, explaining that unlike the risk of a mudslide or the presence of asbestos that renders a particular building dangerous, "the virus exists worldwide wherever infected people are present, it can be cleaned from surfaces through general disinfection measures, and transmission may be reduced or rendered less harmful through practices unrelated to the property, such as social distancing, vaccination, and the use of masks," so that "the presence of the virus does not render a property useless or uninhabitable, even though it may affect how people interact with and within a particular space." 77 Cal. App. 5th at 838. Thus, "the comparison [of

---

[6] Regal contends that the *Consolidated* decision on which Defendants rely is inconsistent with earlier New York appellate precedent construing similar policy language, particularly *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 806 N.Y.S.2d 709 (2005). But the court in *Consolidated* expressly distinguished *Pepsico* as "unhelpful because the product (soda) was, in fact, physically altered so as to render it unsellable to consumers." 205 A.D.3d at 86.

asbestos or other environmental contaminants] to a ubiquitous virus transmissible among people and untethered to any property is not apt." *Id.*

At the hearing, Regal contended that features of the policies at issue here show that "direct physical loss or damage" should be read more expansively in these policies than the analogous terms in the policies at issue in *UTA* and other similar cases. Regal first invokes the policies' terrorism exclusion, arguing that its references to radioactive materials and "pathogenic or poisonous biological or chemical materials," Dkt. No. 1-1 at 73–74, would be rendered superfluous if invisible contaminants did not cause physical damage within the meaning of the policies. But the provision broadly excludes physical damage that results from terrorism, "including action in hindering or defending against an actual or expected incident of terrorism," *id.* at 73, so it is not superfluous even if the presence of radioactive or poisonous materials does not itself constitute physical damage or harm to the insured property, and Regal identifies no authority to the contrary. Nor does the policies' endorsement providing coverage for communicable disease and bedbug decontamination modify the meaning of physical harm or damage, as coverage exists under that endorsement only if the contamination occurs "as the direct result of a covered loss." *Id.* at 158. Thus, the contamination by a communicable disease is not itself a covered loss in the absence of direct physical loss or damage. Accordingly, Regal has not shown that unique features of Defendants' policies require a different reading of "direct physical loss or damage" than the reading adopted by the great weight of authority, which the Court finds is consistent with the plain meaning of the language.[7]

In sum, Regal plausibly alleges that the presence and risk of COVID-19 in its theaters prevents it from conducting business as usual, but not that its property has been physically damaged or altered by the virus. Like the plaintiff in *Consolidated*,

> [w]hile [Regal] vaguely refers to 'fomites' in the surfaces of its [theaters], and states the virus infiltrated the premises, it fails to

---

[7] Indeed, Defendants represent, and Regal does not dispute, that four district courts and the Eleventh Circuit have considered similar lawsuits involving identical language from the same form policy, and all five courts have ruled that the policies do not provide coverage for losses resulting from the COVID-19 pandemic. *E.g.*, *Ascent Hosp. Mgmt. Co., LLC v. Emps. Ins. Co. of Wausau*, No. 21-11924, 2022 WL 130722 (11th Cir. Jan. 14, 2022) (per curiam).

> identify in either its pleading . . . a single item that it had to replace, anything that changed, or that was actually damaged at any of its properties.  Nothing stopped working. . . . Its statement that COVID-19 particles and droplets damage property is merely a conclusion that will not save the complaint from dismissal.

205 A.D.3d at 86; *see also* *Menominee Indian Tribe of Wisconsin v. Lexington Ins. Co.*, 556 F. Supp. 3d 1084, 1101 (N.D. Cal. 2021) (describing similar allegations that COVID-19 physically alters and damages property by converting surfaces to fomites as "unpersuasive, especially in light of the numerous cases across the nation holding otherwise").  Regal alleges no facts suggesting that its theaters need to be repaired, or even that any particular repair or remediation could eliminate the risk of COVID-19 caused by the extended gathering of large crowds—whether in Regal's theaters or anywhere else.  As one court aptly explained while rejecting a similar claim, "the property did not change.  The world around it did.  And for the property to be useable again, no repair or change can be made to the property—the world must change." *Town Kitchen LLC v. Certain Underwriters at Lloyd's, London*, 522 F. Supp. 3d 1216, 1222 (S.D. Fla. 2021), *aff'd*, No. 21-10992, 2022 WL 1714179 (11th Cir. May 27, 2022); *see also* *UTA*, 77 Cal. App. 5th at 833 (noting that the COVID-19 virus "can carry great risk to people but no risk at all to a physical structure").  Accordingly, Regal does not plausibly allege any "direct physical loss or damage" at any of its insured properties.

     In the absence of physical loss or damage at Regal's insured properties, the provisions covering business interruptions from civil or military authorities prohibiting access to Regal's facilities and barriers to ingress and egress—both of which are predicated on physical loss or damage—are not implicated.  Nor has Regal plausibly alleged that any other "attraction business" within a mile of its theaters suffered physical loss or damage from COVID-19 so as to implicate "attraction business" coverage; even if Regal were to identify other businesses that closed, such closures would not be the result of physical loss or damage for the same reasons that Regal's closures are not.  *See* *UTA*, 77 Cal. App. 5th at 840 ("Closure orders across the country were issued in response to the public health crisis arising from the pandemic, not as 'the direct result of' damage to property near [the plaintiff's].  In addition, just as the presence of the virus does not constitute physical loss or damage to insured property, it also does not constitute physical loss or damage to property 'away from' or within a mile of the covered property.").

Because Regal has not plausibly alleged any physical loss or damage to its properties or to any third party's property as a result of COVID-19, the policy provisions it invokes do not provide coverage for its losses as a matter of law.[8] Regal's claims for breach of contract and declaratory judgment therefore fail, and Defendants are entitled to judgment on the pleadings.[9]

## IV. CONCLUSION

Because the losses to Regal's business due to the COVID-19 pandemic and associated stay-at-home orders are not covered by Defendants' insurance policies, Defendants' motion for judgment on the pleadings is **GRANTED**, and Regal's claims are **DISMISSED** on the merits with prejudice.

Regal conclusorily requests leave to amend its pleadings if the Court finds its allegations insufficient and declines to stay the case pending further guidance from California and New York Courts. Although "[t]he court should freely give leave [to amend a pleading] when justice so requires," Fed. R. Civ. P. 15(a)(2), leave to amend may be denied where amendment would be futile, *Foman v. Davis*, 371 U.S. 178, 182 (1962). Regal does not identify any additional facts it would or could allege to show direct physical loss or damage to its properties. Given the overwhelming consensus among federal and state appellate courts that "a business interruption policy that covers physical loss and damages does not provide coverage for losses incurred by reason of the COVID-19 pandemic," *Musso*, 77 Cal. App. 5th at 760, amendment would be futile. *See Consolidated*, 205 A.D.3d at 87 (affirming denial of leave to amend because economic loss from COVID-19 was not "direct physical loss or damage to insured property" and additional facts would not remedy this defect). Regal's request for leave to amend is therefore **DENIED**.

---

[8] It is therefore unnecessary to reach Defendants' additional arguments about the scope of various exclusions. *See Consolidated*, 205 A.D.3d at 87 ("[H]aving determined there is no coverage, we need not address whether any of the exclusions to coverage apply to bar coverage for plaintiff's claims.").

[9] Regal suggests that some of Defendants' positions are in tension with Zurich's arguments in two other cases that COVID-19, rather than government stay-at-home orders, was the proximate cause of the insureds' losses. Dkt. No. 36 at 19. Regal does not raise an estoppel argument, and in any event, nothing in Defendants' motion or the Court's ruling appears to be inconsistent with Zurich's positions in other cases.

A final judgment will be entered separately.